Thank you. Good morning, Your Honors. Paul Carelli on behalf of the Sweetwater Union High School District. I'd like to reserve three minutes of time for rebuttal. Your Honors, as a threshold matter, we have a procedural issue, and that is that there is still pending a motion to dismiss this particular appeal due to lack of the court's jurisdiction. And I did want to take the time just for a moment to discuss with the court the fact that the appellants have brought this as an interlocutory appeal under 1291, which is for the injunction, the court issued a permanent injunction. And the appellees have taken opposing arguments in the Court of Appeal and in the District Court. In this court, they say that this injunction is not satisfactorily specific enough in order to maintain an appeal. In the lower court, on the other hand, they have filed a motion to have the school district comply with the injunction, and that court has granted at this point that motion. In other words, the District Court has found that the school district is currently not in compliance with the injunction. As far as the school district is concerned, the injunction is complex enough and specifies enough detail to get it past the test for an interlocutory appeal at this point. Is there any particular questions on that threshold matter? I think we have that well in mind, unless anybody else has a question. Okay. The second procedural point is just a minor one, and that is on motion to strike a portion of the appellant's opening brief. From the court's order, it appeared that there was quite a broad striking of material, whereas the actual graphs I think that the plaintiffs were pointing out in some of the arguments pertaining to those graphs was actually fairly small. And some of the material and arguments were already made in the District Court, and so I wanted the court to take a look again if it would reconsider some of those points. The graphs also simply took the data points that were already in the record in the District Court and simply re-plotted them in a way to make them easier to understand. So we would ask the court to take a look at that one more time. Do you have any questions about that, either of you? No. I understand your argument, Counselor. Thank you. I appreciate what you're suggesting, and we have that well in front of us. Okay. Thank you. I'll be fair. Our questions do not suggest that we do not understand your argument, nor that we have not considered the question. It only says that we don't see any questions that we need to give at this time of those issues. Thank you, Your Honor. And we're prepared to move to the merits. Thank you, Your Honor. Well, I'm going to start with the motion for a summary adjudication. The court found that the school district was not providing meaningful and equal opportunities for female athletes, and the school district disagrees on several different points. Let me ask you a question, which is kind of a practical question, Counselor, given that you've gone to trial on other issues. If, in fact, I mean, there are several issues in front of us today, but as we look at those issues, we've got something about the expert witnesses, we've got something about the exclusion of witnesses, we've got something about when it issued the injunction without contemporaneous evidence, those kind of issues. But as I look at those issues, those have to do with the trial. The trial has been had if, in fact, we do not agree with you as to those issues. In other words, if we say the trial was well done, well within the discretion of the district judge, of what difference will it make as to the summary judgment on this issue? Well, as a practical matter, the injunction incorporates the findings of the motion for summary adjudication. I understand that. I understand. But as to the actions, the practicality of what is required by the injunction, are there parts of it that are specific as to this particular issue that you would like to undo? Or does the injunction, as it is now to be enforced against the school district, would it make any difference about this particular issue given the injunction? Well, I think it would, Your Honor, particularly because, again, the plaintiffs have already brought a motion to enforce the injunction. I understand that. But what would be the difference in the enforcement? What would be the different action that would be taken by the school district on this one issue? Well, there would be no different aspect taken by the school district. The school district is constantly trying to Based on the trial and the injunction entered in the trial, I worried why the school district wants to pursue this particular claim. Because it is a district. I know that it's a summary judgment. And I know what it says. But the end, in reviewing the injunction itself, and the fact as to what the school district needs to do in order to, if you will, do what the injunction suggests they do do, I'm wondering why is it the school district is really that anxious about this one issue when the injunction, if we don't go with the school district on any other issue except this, the injunction wouldn't change at all? Well, it seems to me that the injunction incorporates equal opportunities. Maybe I'm incorrect, Your Honor. But it seems to me that the district court is saying not only do you have to do X, Y, and Z in terms of having the facilities the same and whatnot, but also the district court is expecting the school district to comply with Title IX in terms of the athletic opportunities. And the school district is certainly working towards that. But in reading the injunction, I don't find anything that's prescribed therein that would not come from those issues already determined by the trial, not including the summary judgment. That's why I'm asking you the question. Yes, because I think that as a whole, that the facts as they are presented are inextricably intertwined in terms of the opportunities and the athletic facilities and all of that material. Well, it seems to me that your real argument as to this issue is there are facts that the district court could not ignore on a summary judgment, and therefore we ought to have a trial about those. Yes. That's the best your argument can do. I agree. Okay, so we had a trial. We didn't have a trial on this particular issue. That's correct. And we have a result from the trial. I agree. And I'm trying to figure out, again, how would the result change if this issue went to trial, even if you won, because of the issues the district court has already determined and the injunction already entered? Well, as a practical matter, the finding of summary adjudication is important because if the district were to prevail on that particular claim for equal opportunity and assuming that the school district also had a new trial on the injunction, the school district... Well, that's assuming that we're going to undo all of the other issues. Otherwise, the trial will stand as to all other issues. Yes, that's true. But as a practical matter, the school district was obligated to have this court address both the summary adjudication and the injunctive issues all on this one appeal. I understand. All right. Sorry to interrupt you, but it seemed practical to me that we had this one issue where we're saying if the district court had given us a chance to present some facts, we would have had a chance to go to trial, and they didn't consider the facts. And on summary judgment, we have every benefit of those facts. And so, therefore, the district court was wrong. That's your argument. Yes. So I looked at that, and I said, okay, I'll give him credit. Supposing I do, how does that change the result? So I looked at the injunction, and frankly, couldn't find a result to change. But as a practical matter, as Your Honor is asking, a reversal of the summary adjudication and a reversal of the injunction puts us all back at square zero. Both do, but you've got to win on every issue. I don't disagree, Your Honor. All right. And we're together. Counsel, Judge Gould, if I could ask you a question. Could you address your argument to the, I think there are three prongs under the regulation that are pertinent to unequal opportunity to participate in athletics. Could you run through your position on those three points? Yes, thank you, Your Honor. Well, the positions that the school district is taking is that the regulations that have been promulgated certainly have been specific as to colleges, but they do apply to high schools. The school district isn't taking that different position. However, a high school is fundamentally different than colleges in terms of athletic opportunities. And there's no specific scientific formula for determining equal opportunities. So we look at the three tests. In terms of the first test, the school district is taking the position that female athletes had equal opportunities to participate in athletics as the boys did. The girls had more sports offered than the boys at the time of the summary adjudication, the 2007-2008 school year. There was 23 sports offered to girls and 21 offered to boys at that time. The fact that girls didn't necessarily participate in those sports doesn't mean that they weren't given the opportunity to participate in those sports. As a practical matter, sometimes athletes... I would say this. There are opportunities in colleges where colleges are set up so that the sports become magnets for athletes from high school to go from high school to college level to play those particular sports. For example, if there's a tennis player at the high school level, they're looking for a college to play college tennis. At the high school level, on the other hand, we have a pool of students which is set by district boundaries. The school district can't recruit. All they can do is have the students that are there and encourage them to participate in athletics. And the school district does, in fact, encourage participation in athletics. And they want girls to participate in athletics. And we had some very successful athletes over the years in this particular school. So the fact that there's opportunities... And you can see in the record, one point I would make clear, is that there was a change in coaches from Martinez to Yuhas Russo. And you saw the women's participation increase from 30 participants to 50 participants. So it's not like there's a set number of roster places, as in college, in which the coach in college has to cut players because they have too many people trying to participate for the one particular sport. Here, for the most part, the school's Castle Park's sporting teams have a no-cut policy in which any number of athletes can participate. And so there's opportunities for girls to participate. And in terms of the second prong, which is the fact that... What the district court determined is that substantial proportionality requires a close relationship between athletic participation and enrollment. And 6.7% difference does not show a close relationship because that is equivalent of 47 girls. And that's large enough, at least one viable competitive team and likely several competitive teams. And so the court said they failed to provide female students with opportunities to participate in athletics in substantially proportionate numbers as males. As I understand it, that was what the district court said. That's what the district court said, and it's based upon... I mean, what evidence is there in this record which you're going to present which is contrary to that? I didn't find it. Well, the point is this. The 47 students and the 6.7%, that's based on a regulation that says that... And again, the regulations are specific to colleges, which is a different realm than high school sports. And what the regulation says is if you've got this number of women, say 47, in college, certainly there may be a sport that's available for those girls to play. Colleges have the resources to be able to field some additional teams. High schools don't necessarily have those same resources, but the difference, again, in the high school level is that in high school, any number of girls can participate without being cut in a particular sport. They don't have roster limits. They don't have scholarship limits that the colleges have. So that's why the regulation's there, because the regulation says it's likely that colleges could field a particular team, whereas in the high school level, that's not necessarily true, as long as there's athletic opportunities for women to play those sports. So is there any evidence you're going to give? I mean, the district court has got to give you every benefit of the evidence you present, but I'm still... Good argument, maybe, but what are we really focusing on? What did the district court not give you the benefit of? Well, the district court... It's pure speculation that the school district would be able to field a team, even assuming there's a 6.7% deficit, because when you look at the athletes that are participating, they already have access to 23 particular sports. So if you have 47 girls that aren't participating, that's what, two girls per level. That's all the participation numbers have to come up, and yet the girls aren't participating in those numbers. And why they're not participating, I assume, depends on... Well, counsel, isn't it true, when you read the record, go through the facts of this case, as the district court did, that while you're speaking of opportunities and proportionality and the numbers and we're looking at percentages, that not only was there a deficit in the number of girls participating, but the facilities in which they would have allegedly participated in these sports were clearly substandard and had not been taken care of, and as if the district said, well, we have the program for you, we just don't have a place for you to do it and do so safely. Wasn't that also part of what was looked at in the district court? Because they compared a one with softball fields to baseball fields, and those are pretty equal across the board, but they weren't equal. Isn't that correct? Well, I disagree with Your Honor because of two things. Number one, I think the summary adjudication is separate from what the trial on the facilities issue. Number two, if you were to go to those fields at the time of trial and take a look at the softball field compared to the baseball field, I think Your Honor would have found that they are substantially the same. And the girls' field might actually have been in better shape at that point than the boys' field. And in fact, the expert who was excluded had his report said that at the time he went and looked at the field. And that's the expert from where? The expert that was excluded, Dr. Schiff. And what was that expert's experience? Well, he had experience as a superintendent of a school district in running athletics. He was also the president of the California Interscholastic Federation. So he had experience looking at fields. And also the other expert, Penny Parker, went and looked at the fields. And the district court judge was also invited and said that he would take a look at the fields during a site inspection, but that didn't occur either. And I think that those fields, if you were to take a look today, Your Honor, you would be amazed. Today is not the issue. I understand. At the time of trial, those fields were substantially the same. And the locker facilities were substantially the same. And the facilities generally were substantially the same. The school district took a lot of effort over the years to upgrade its facilities for both boys and girls to make sure that the opportunities and the experiences for all its athletes are good. The school district is not interested in having substandard facilities for its athletes. So to answer your question, I would say that. Counsel, there's a question. I just wanted to shift your focus very briefly because I know your rebuttal time has maybe gone. But I'll ask Judge Smith to give you a minute or two extra after you hear from the other side. You haven't addressed pretext and the retaliatory. The district court found that the firing of the softball coach for the women was retaliatory. I know the district had some legitimate reasons, but the district court held found that they were pretextual. So my question is, is that something that under precedent we have to review for clear error? Yes, Your Honor, I think you have to review that for clear error. But as a primary point before you even get to the pretext is the question of whether this cause of action can be brought by athletes at all when they're challenging the fact that a coach has been changed and they're not happy with the coaching change. And there's been a second coaching change between the time the first coach left and the time of trial where that particular coach was not permitted to come and testify based upon the district court's conclusion that he was not identified as a witness. So that's the first thing. We've argued at length that the athletes do not get to choose their teachers. They do not get to choose their coaches. But when they terminate the coach, they terminate the program. That's what happened. No, that's not true, Your Honor. Well, they didn't terminate the program, but effectively by not having a coach available, the girls could not participate in softball. I disagree, Your Honor. Where were they going to be coached by? They were coached by Ann Ulas-Ruza. How long did it take for that to take place? As far as I can tell, I don't think there was a chance. There was a gap in time between the time of the termination of the coach and the time that another person was found. And it's not, as I see it, that they are complaining that a particular coach was fired, but more that by firing it, it had the express effect of terminating the program during the course of the school year. But the coach was found. And the coach at the time of trial was a coach that was completely different. And the program was increased in popularity. It had increased in the number of athletes. The facilities were continued to be upgraded. The field was continued to be upgraded. And the facilities at the time of trial were, again, in very good shape. But I don't think that, again, that the girls can complain unless, if in terms of the type of coach that they want, the testimony was that they weren't happy with a particular coach. They didn't feel that she had great experience or was good enough to be a coach. But she was a teacher on campus, and that has some merit. You want to have a teacher on campus to be an extracurricular coach. I think it's important that way the students have access to that particular coach during the school day as well as in the after-school program. Thank you. Thank you. We appreciate your art. Judge Kuhl, did you have other questions? No, but I would appreciate if we would let the school have a minute or two for rebuttal after the appellees have had their say. No, no problem. You're the presiding judge, and I'm just the conducting judge, and you've suggested it, and it will happen. Thank you. Thank you, Your Honor. Good morning. Elizabeth Kristen from the Legal Aid Society, appearing on behalf of the plaintiffs and the appellees in this matter. With me at council table are my co-counsel, Vicki Barker, from the California Women's Law Center, as well as Erin Flynn from the United States Department of Justice. And as Judge Smith noted, we will be sharing six minutes of our argument with the government. I'd like to first address the two preliminary issues that my counsel brought up, the issue of appellate jurisdiction and the issue of the motion to strike. As Your Honors are aware in our motion to strike, the appellants took the position that the injunction was clear, it was specific, and they could be held in contempt if they didn't follow it. This court agreed with them preliminarily, and we took the appellants at their word, and we filed a motion to enforce the injunction. The court did find that they were not in compliance, and contempt proceedings are currently pending. So I don't believe the issue of appellate jurisdiction is any longer a question here. With respect to the motion to strike, I believe the court's order is quite clear with respect to the pages of the brief and the other materials that were stricken. Council didn't file any motion for a reconsideration, and I believe that, too, is clear. To move on to the three-part test, which I know Your Honors focused some attention on, the district court was correct as a matter of law, and there were no disputed facts here. Every fact put forward in the motion for summary judgment was taken from defendants' own admissions and own papers. And they didn't dispute any of these facts below. Well, the worry that I have is, and I guess since we're on the three-prong test, the worry I have is that it's a summary judgment standard. And a summary judgment standard, as I understand it, is something that we ought to give every consideration to what they suggest and every intent thereof. And as I understand it, the court really concluded that a 6.7 disparity is substantially disparate. That's what the court said. That's correct, Your Honor. And I'm having a tough time understanding, without hearing the evidence, how one can do that. I'd be happy to address that, Your Honor. With respect to the 6.7% disparity, Title IX guidance on this is very clear. The first part of the test, remember there's three parts, and the district can comply under any part. The first part really does just look at the numbers. It looks at the number of athletes actually participating, not potential participants, not ghost opportunities that are theoretically possible. This court was very clear in the Mansourian case that it has to be actual athletes participating. And so you look at that, and you look at the disparity between that percentage and the percentage of girls enrolled. And the purpose behind this is because Title IX is an anti-discrimination statute, and what it said was we expect that girls will participate in numbers proportionate to enrollment, given the absence of discrimination. And so this is essentially a safe harbor for a school to offer opportunities proportionate to enrollment. They can then comply with Title IX. But don't we also determine this on a case-by-case basis? Yes, we do, Your Honor. And so why isn't this a case where the district court should determine the causes of the disparity and the reasonableness of requiring the schools to add additional opportunities to eliminate the disparity, that this is not the case where we really need to hear the evidence and determine exactly what it is. We know what the disparities are. We know what the situation is. But the district was not really given the opportunity on this particular issue, though at trial they were, on this particular issue, to explain the causes, to explain the reasonableness of requiring the school to add additional opportunity. And that happens at trial. That's why district courts have trial. Well, Your Honor, I would disagree here that the district was not allowed to present evidence of the causes and reasonableness. I'd also disagree that that's relevant under the first part of the three-part test. Under the first part of the three-part test, we really are just looking at numbers, is it a disparity, and how many slots are they, essentially the magnitude of the disparity. But in Parts 2 and Parts 3, the district is free to bring evidence that it has a history of steadily increasing proportional opportunities for girls. It has to show a history and a plan for expansion. And the district was free to put in summary judgment any evidence that they chose to do so. The record is before this court. And they did not provide evidence of a history or a continuing practice of program expansion. That was their affirmative defense to prove. And they failed to meet it, and the district court- Because those are the second and third tests, right? Say that again? Because those are the second and third tests? The second test is the history and the continuing practice of program expansion. That's the affirmative defense borne by the district. Again, they were free to put in whatever evidence they liked at summary judgment, and there was no restriction on the evidence that they were able to present to the district court. And he considered whether they had a history and continuing practice of program expansion. Again, that's Prong 2. And recall that during this time period, there was undisputedly cuts in athletic opportunities for girls. This school cut field hockey, despite the fact that there was interest among girls in participating in field hockey. They cut field hockey solely because they couldn't find a coach. Similarly, they cut girls' water polo. They cut girls' tennis. And courts do not find a history of expansion when the teams are being cut. And that's because the second prong of the test was really looking at the fact that in 1972, when Title IX was passed, schools were going to need some time to get into compliance with Title IX. So Prong 2 recognizes that, and it says, look, since Title IX went into effect, since the regulations went into effect, since they were supposed to be in full compliance by 1978, we're going to give schools some time to bring opportunities up to par over time. This school chose not to do that. The district court correctly found they didn't have a history and a continuing practice of program expansion. But moving on to Prong 3, that's the prong that addresses interest. That is another potential cause or reason why girls might not be participating in athletics. And here it was undisputed. We showed with undisputed evidence that girls were interested in participating in athletics in greater numbers. Again, there was a team, a viable team cut. Field hockey was cut during this time period. And what the guidance from the Office of Civil Rights says is that if there are teams cut, there will be a presumption that the plaintiffs have shown interest. We show interest here. Let me take the devil's advocate to that. Your side was that field hockey was cut twice, and the district court seemed to very much emphasize that. On the other side, the other facts that were presented, if I have them wrong, you can tell me, was that cutting field hockey seemed reasonable because there was no conference in the area. There were only nine interested people, and it takes 11 on a team. And the tennis and water polo, two out of the three years under review, were now being offered. Those facts did not seem to be integrated into the district court's summary judgment decision. And, Your Honor, with respect to field hockey, those were not the facts below. The defendant's witnesses, who are the person's most knowledgeable, said that field hockey was eliminated because of their failure to find a coach. It was not because of this alleged lack of a conference. Moreover, there was... So this is just something in the briefs now? Correct, Your Honor. They did not have the evidence below to say that they were eliminating field hockey because of lack of a conference. Now, they did make an argument that field hockey should not count as a sport because it was not allegedly recognized by CIF. I didn't give that much credence. I was just trying to say, I'm a district court now. I'm trying to make a summary judgment on this particular issue. And I'm saying, what facts are there in this record which I did not take into effect and give every benefit of the doubt to? That's what has to happen. That's the most worrisome to me about the first issue, that this is summary judgment. And I appreciate that, Your Honor. But I would say that we have shown through our briefing and in the record that we presented below that the evidence of girls' interest in these sports was taken almost completely from the defendant's own witnesses. The defendant's person's most knowledgeable on athletic participation and other participation activities said that there was interest among girls in field hockey, in water polo, in tennis, and that this interest was not accommodated because they eliminated these teams. And this is all collected in footnote 17 of our answering brief with citations to the record. And defendants have raised, at least in part, a cost argument here. But, in fact, in their reply brief, they said that budget cuts to this district did not lead to any cuts to women's sports. Also, I would just point out that cost is not a defense under Title IX. And if it were, summary judgment was properly granted on defendants' cost arguments and defenses as well, and that's included in the summary judgment order. Defendants did not oppose that. Counsel, Judge Gould, if I could ask you a question on the theory here. In terms of substantial proportionate opportunity, why do we look at the number of athletes participating rather than number of teams, which the school district argued in its opening argument? Yes, Your Honor, with respect to Prong 1 of the test, there is no guidance whatsoever to say that teams would be counted. And I'm not sure that defendants had argued that in their briefs, although I did hear them argue that today. But the reason that the number of teams shouldn't be counted under Prong 1 is because guidance is clear from the Office of Civil Rights to which this Court has given deference, that what we're interested in is the number of athletes actually participating. And this Court said in the Mansourian case the number of participation opportunities is defined by the number of women who actually participate in athletics. And those who participate in more than one sport are counted as a participant for each team in which they participate. The OCR clarification from 1996 is also clear on this, and it says, you know, OCR, people suggested to OCR that the Court count, that they count unfilled slots. And OCR said actually you have to count actual athletes because participation opportunities must be real and not illusory. And that's why counting the number of teams is not the correct measure under any parts of the three-part test. We really need to see are there actual opportunities. It was also undisputed below that the number of teams that defendants put forward were not actually teams on which any girls participated. There was a table in our summary judgment briefing, it was Table 5, that eliminated the alleged sham teams for girls, for example, counting three levels of football when zero girls were participating in football. And so even if you looked at the accurate number of teams, that number did not show a continuing history of expansion. So we submit that you don't count teams, that that's not the relevant comparison, but even if you did, that the summary judgment for the plaintiffs was still proper. I wanted to... I wanted to point out that the fact that it's proportionate seems to be something that one determines when one has seen the evidence. And again, I realize your argument is the number is all we're looking at here, but I, you know, the Second Circuit in Bidinger did not suggest that that was it. In fact, they said bright lines statistical tests should not be the basis for the determination. So again, I'm looking at this evidence. I'm looking at what they have. It seems to me that one should determine in making the first analysis the cause of the disparity, not just the number, but the cause, the reasonableness of requiring the school to add the additional athletic opportunities to eliminate the disparity. And at that, the district court did nothing. And that's my worry about the summary judgment. Well, Your Honor, that is incorrect under Part 1 of the three-part test. The three-part test is not about why is there a disparity. Because Bidinger says we don't look at a bright line statistical test. I think that's a slightly different point from the Bidinger case, Your Honor. Well, we don't only look under the three-part test as a bright line statistical test. Under Prong 1, we do only look at the numbers. Now, in Part 2 and in Part 3, you do consider the specific circumstances of that school, the causes for the disparity, the reasons for the disparity, interest expressed by girls. But under Prong 1, you look at only the percentage disparity between enrollment and participation, and then you look at is that enough to form a viable team. And that's all you look at under Prong 1. That's not the prong of the test where you're supposed to consider reasonableness or causes. Those issues are addressed under Prong 2 and Prong 3. Prong 2 and 3 don't really seem to talk about reasonableness. They seem to talk about instead, if you will, affirmative defenses. Well, Prong 2 is an affirmative defense, Your Honor. And so is 3. Well, 3 is not necessarily an affirmative defense because here what happened is that we were able to show that interest among girls was not being satisfied because a team was cut. Well, I think what you did is destroy the affirmative defense they may have come up with. I mean, that seemed to me to be the evidence. Well, Your Honor, under the Cohen case, the second part of the three-part test is the affirmative defense. And then under the third part of the test, if you look at Cohen and if you look at the 96 and the 2010 guidance, what you see is that if the plaintiff puts forward evidence that a viable team was cut, there's a presumption of interest. That can be rebutted by the defendants if they bring forward clear evidence that there is no longer interest. But with regard to your bigger point about reasonableness, Title IX has been around for 40 years. And it's supposed to provide full and equal athletic opportunities for girls. There's no evidence in the record that girls are less interested in participating in sports or that there's a reason why girls shouldn't get the full and fair opportunity to have the benefits that sports participation provides. And so what the three-part test looks at, it looks at whether girls are being denied in a discriminatory manner the full and fair opportunity to participate in sports. And any excuses that the school has with respect to that are taken into account with respect to prongs two and three. Counsel, you were going to let the United States, as amicus, argue for a number of minutes. And I think your time may be using that up. Did you want to let them argue? I do. Thank you, Your Honor. If I could just make one more point on the three-part test. I just wanted to point out that the injunction order itself does require, or at least as the joint compliance plan conceives of it, does require the school to add additional teams and it does require the school to accommodate interest. I'd also be happy to answer any other questions that the panel has. Thank you. May it please the Court, Erin Flynn on behalf of the United States. Your Honors, as Judge Gould noted, we participated solely as to this issue of whether the school district provided equal athletic opportunities to its female students. And on that issue, we'd ask the Court to affirm the grant of partial summary judgment to the plaintiffs. I think that based on today's argument, the best place for me to start is on prong one and this notion of substantial proportionality. The district court here made no error on the legal standard and there was no triable issue of fact presented by the defendants in order to take this case from summary judgment to trial. I think that here it makes sense to distinguish this case from Bidiger, which Your Honor raised as the Second Circuit case that most recently addressed solely this issue of the three-prong test. That's the one I concentrated on because of that. And what Bidiger was saying about the there's no magic number or no sort of set ratios that a school has to show was in response to the school district's or university's argument there that the 3.62% disparity wasn't large enough to show that they hadn't reached substantial proportionality. And what the reason that the court there brought that case from summary judgment to trial was because there were questions of fact about the actual numbers that the university was putting forward in terms of counting the female athletes in the second part of the analysis. So you look at both the male and female student composition of the overall student body and then you look at the male and female composition of the athletic program. In Bidiger there were triable issues of fact as to how many women should be counted as participants in the athletic program because females were on the cross-country team participating in the track team. There were red-shirted females who they were counting as part of their numbers of athletic participants. And then there was also a question of whether or not the cheerleaders and competitive cheer should be counted towards the number. And so that's why there was a triable issue of fact because the court had to resolve what is the actual number of female participants in this case. Here the court took the numbers that the school district offered as to its male and female enrollment and as to the male and female composition of the athletic program. And it reduced that into this 6.7 percent disparity. I think the question that your honor was asking about, which is what do you do with that and is it reasonable now that you have. What is the cause? What was the reasonableness of requiring the schools to do it? Exactly. You don't look at reasonableness as Ms. Christen said in prong one. You look at sort of the constellation of factors in prong three. And so all the first prong is doing under the OCR guidance and policy interpretation is saying look, we have a school district that has sex segregated athletic programs which it's allowed to have under the Title IX regulations. And are the resources that the school has allocated to that program, you know, equally allocated between its male and female students. So where you have some sort of disparity and here it's still the 6.7 percent where the case specific analysis that Bidiger was talking about and that the interpretive guidance is talking about comes in is saying what does 6.7 percent mean for this university? What does 6.7 percent mean for this school district? And here the 6.7 percent meant 47 lesser opportunities for the female athletes. And so you look at what is the general size of the female student programs at the school or the university. And if the programs are such that 47 students would equate to a viable team, then the university or school district hasn't shown substantial proportionality because it could add a team in order to more effectively round out the participation opportunities among its male and female student body. So unless there are more questions about that, really the case specific analysis looks at what are the general numbers of the female sports teams that are offered at the school? Would the 47 students or sort of the number based on that school's overall enrollment and the size of its athletic program support an additional team? And as to that issue, we would say that the district court correctly applied the standard that's been set forth and accepted amongst the courts of appeals on this issue and that there was no triable issue of fact. Thank you. I think your time has run. I'm over. I'm so excited to address this. I'll give you 30 seconds. In sum, we would say across the board on this that the Title IX regulations and the interpretive guidance equally apply in the context of high school athletics and that as to each of the three prongs, the district court correctly looked at the participation opportunities, the actual number of female students participating and correctly concluded that summary judgment was appropriate in this case. Thank you for your argument. Counselor, you have two minutes in rebuttal, even though we took you over. Good Judge Gould says, Smith, give him some time. Thank you, Your Honor. Just as a minor point, I think there is a difference between colleges and high school in that high schools sometimes do not have the financial wherewithal to add particular teams or the circumstances may be such where adding a coach at a particular time may be incredibly difficult. Well, what do you do to respond to the argument made, which I saw myself? You said finance was a problem and then in other parts of your brief you said it didn't have anything to do with what you did here. In terms of comparing boys sports to girls sports, in terms of the amount of money, let's say you have a baseball and a softball team, both teams should have equal finances. I agree that there should be no difference between the boys team and the girls team in terms of the amount of finances that are spent on each particular team. However, when you are looking at adding a particular sport at this level and you may have to, first of all, you have to make sure that the facilities are there. Second of all, you have to make sure that there is a coach who is certified in a particular sport and that is not always that easy to do in particular school districts. So in terms of those causes, I think those also have to be looked at in terms of the trend of adding teams. But what you see in terms of the trends of the schools is from the 10 years starting from the late 90s, you see an increased participation in female athletes that went up from, if I recall, something like 14% to a 6%, 6.7% deficit that Your Honor was talking about and an increase in the number of teams that were available for girls each year. Even though there were some sports that were cut along the way due to lack of participation or the fact that they couldn't find a particular coach at a particular time. So we are looking at those trends. The school district, again, is not interested in having girl athletes have a bad experience. They want the girls to have a great experience and they want the school facilities to be great. So with that, Your Honors, I will submit. Thank you very much.
judges: England, GOULD, SMITH